**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **USA TECHNOLOGIES, INC.** | : | **CIVIL ACTION** |
| | : | |
| **v.** | : | |
| | : | |
| **BRADLEY M. TIRPAK, _et al._** | : | **NO. 12-2399** |

<u>**MEMORANDUM OPINION**</u>

**Savage, J.**                                                                            **May 24, 2012**

Plaintiff USA Technologies, Inc. ("USAT") seeks a preliminary injunction enjoining the defendants, a group of USAT shareholders acting as S.A.V.E. Partners, IV, LLC ("SAVE"),[1] from making certain statements about the company and those responsible for its management, which it contends violate a non-disparagement provision in a settlement agreement.[2]  The defendants argue that USAT has failed to show that it will likely prevail on the merits and it will suffer irreparable harm unless an injunction is issued.  Alternatively, they contend that a preliminary injunction would constitute a prior restraint on their free speech rights guaranteed under the United States and Pennsylvania Constitutions.

After reviewing the parties' submissions and after a hearing, we conclude that USAT is entitled to a preliminary injunction.  The statements, in their original form, violate the non-disparagement provision of the parties' agreement.  In the negotiated settlement agreement, the parties waived their respective rights to the speech USAT seeks to enjoin and agreed that an injunction was an appropriate remedy for a violation of the settlement

---

[1] The plaintiff has named as individual defendants Bradley M. Tirpak, Craig W. Thomas, John S. Ioannou, Ajoy H. Karna, Rodman K. Reef, Andrew Salisbury, and George Wallner.  These defendants are members of S.A.V.E. Partners IV, LLC, which is purportedly managed by Locke Partners I LLC, also a named defendant.  The defendants shall be referred to collectively as "SAVE" or "defendants."

[2] At the conclusion of the hearing on May 9, 2012, the parties agreed that the motions for a temporary restraining order and for a preliminary injunction should be decided on the record established at the hearing.

agreement.  Thus, we shall grant USAT's motions for a temporary restraining order and for a preliminary injunction.

## Background

USAT, a Pennsylvania corporation, provides networked credit card and other non-cash payment systems in vending, commercial laundry, hospitality, and digital imaging industries.   Defendant Bradley Tirpak is a former USAT board member, current shareholder, and leader of SAVE, an organization that has initiated a proxy contest to place a slate of candidates on USAT's Board.

The parties have a contentious past.  Beginning in the Fall of 2009, the parties have made charges and countercharges of nonfeasance and misfeasance.  SAVE charges mismanagement of USAT by the current board members.   USAT accuses Tirpak of misconduct during his tenure as a board member.  The rhetoric has arisen in the context of SAVE's campaign to replace the current members of the board with its candidates.

During this vitriolic dispute, the parties have signed three settlement agreements. The Second Settlement Agreement, dated May 19, 2011, contains a broad "non-disparagement" provision, which applies to all signatories.  It reads in relevant part:

> Each party to this Agreement agrees that he and it will not express, orally or in writing, any disparaging or unfavorable remarks, comments or criticisms with regard to: (a) the Company and/or its directors, officers [or] executives . . . concerning any action taken or statement made by any of them prior to the date of this Agreement, . . . or (b) SAVE, Thomas, Tirpak and/or Michel concerning any action taken or statement made by any of them prior to the date of this Agreement, including but not limited to any positions taken or expressed, orally or in writing . . . . Each party to this Agreement further agrees that he and it will refrain from engaging in any publicity or any other activity that damages or impairs, or could damage or impair, the business, goodwill or reputation of the Company and its directors . . . or of SAVE,

Thomas, Tirpak and Michel concerning any action taken or statement made by any of them prior to the date of this Agreement, including but not limited to any position taken or expressed, orally or in writing . . . .[3]

There are four exceptions.  Pertinent to this action is section 9(c), which provides:

Nothing in this Section 10 [sic] shall prohibit or restrict any member of the SAVE group or any of the Company Released Parties from . . . (c) complying with any disclosure obligations under the rules and regulations of the SEC or other securities laws . . . .[4]

USAT shareholders will elect a new board of directors on June 28, 2012.  SAVE has nominated a slate of candidates for the board, including Craig Thomas and Bradley Tirpack.  The campaign has increased the heat of the rhetoric.  Shortly after SAVE announced its nominations, USAT issued a press release with the sub-heading, "Bradley Tirpack, Former Board Member Accused of Code of Business Conduct and Ethics Violations, Trying to Gain Control with Zero Premium to Shareholders."[5]  SAVE countered one week later, posting a press release on its website.  The press release contains several statements about the performance of USAT's Board and some of its members.  USAT contends that the following statements in the press release violate the Second Settlement Agreement's non-disparagement provision:

Since Stephen Herbert became President and COO in August 1999, the Company has accumulated net losses each fiscal year, totaling more than $175 million.  During that time, the Company's stock price has declined over 99%.
. . . .

---

[3] Second Settlement Agreement § 9.

[4] Second Settlement Agreement § 9.

[5]  Def.'s Mot. in Opp. to Pl.'s Mot. for a TRO Ex. 9, at 4.  SAVE initially challenged this statement as violating the non-disparagement provision, but has appeared to abandon the argument.  Tirpak was accused of violating USAT's Code of Business Conduct and Ethics before and after the non-disparagement provision's operative date.

3

The Board approved four securities offerings from March 2010 to March 2011, and shareholders have been diluted by over 43% in the past two years.

One long-standing Board member, Douglas Lurio, has billed the Company over $2,300,000 through his small law firm during the past five fiscal years while collecting an additional $100,000 in Board fees during that time.
. . . .
Eliminate Wasteful Spending . . . Mr. Lurio's small law firm has billed the Company over $2,300,000 during the past five fiscal years . . . .[6]

Prior to the hearing, SAVE issued a preliminary proxy statement on behalf of its

slate of candidates.  Under the heading "Reasons for the Solicitation," SAVE states:

Over the past one-, five- and ten-year periods, ended [sic] May 1, 2012, the Company's share price declined approximately 45.0%, 84.7% and 95.2%, respectively.
 . . . .
In the last three fiscal years ended [sic] June 30, 2011, the Company has reported operating losses and overall net losses, each totaling in excess of $30 million.
 . . .
In the fiscal years ended [sic] June 30, 2011, June 30, 2010 and June 30, 2009, net cash used in operating activities was approximately $5.2 million, $12.3 million and $8.5 million.

USAT argues these statements also violate the non-disparagement provision.


**Preliminary Injunction**

In determining whether preliminary injunctive relief is available, we weigh four

factors: (1) the likelihood that USAT will succeed on the merits; (2) the threat of irreparable

harm to USAT if an injunction is not granted; (3) whether granting an injunction will result

in greater harm to the defendants than USAT; and (4) whether injunctive relief will be in the

public interest.  *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 20 (2008); *N.J. Retail*

---

[6] Pl.'s Compl. Ex. C, at 1 (emphasis omitted).

*Merchants Ass'n v. Sidamon-Eristoff*, 669 F.3d 374, 385-86 (3d Cir. 2012).  The moving party bears the burden of persuasion.  *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997). Failure to establish that any element weighs in its favor will result in the denial of a preliminary injunction.  *Bimbo Bakeries USA, Inc. v. Botticella*, 613 F.3d 102, 109 (3d Cir. 2010).  Although USAT's underlying action is a state law breach of contract claim, we apply a federal standard in examining the motion for a preliminary injunction.  *Instant Air Freight Co. v. C.F. Air Freight, Inc.*, 882 F.2d 797, 799 (3d Cir. 1989).

*Likelihood of Success  on the Merits*

Initially, we determine the likelihood that USAT will succeed on the merits.  *ACLU v. Black Horse Pike Regional Bd. of Educ.*, 84 F.3d 1471, 1477 (3d Cir. 1996).  The test is not whether it has succeeded on the merits, entitling it to permanent relief.  *Id*.

At the core of this action is the non-disparagement provision in the Second Settlement Agreement.  The parties disagree on the meaning of the provision.  Thus, we must interpret that contract language.

Under Pennsylvania law, which the parties agree governs, our primary task in contract interpretation is determining the intent of the parties.  *Truserv Corp. v. Morgan's Tool & Supply Co.*, 39 A.3d 253, 260 (Pa. 2012).  When the words of a contract are clear and unambiguous, we ascertain the intent of the parties based on the common and plain meaning of the words used.  *Id.*  Effect must be given to all the provisions in the contract. *Murphy v. Duquesne Univ. of the Holy Ghost*, 777 A.2d 418, 429 (Pa. 2001) ("The whole instrument must be taken together in arriving at contractual intent.") (citation omitted).

We construe a clear and unambiguous contract as a matter of law. *Trizechahn Gateway LLC v. Titus*, 976 A.2d 474, 483 (Pa. 2009). On the other hand, where the contract is ambiguous, it is for the factfinder to ascertain the parties' intent. *Id.* Merely because the parties interpret the contract differently does not mean it is ambiguous. *Espenshade v. Espenshade*, 729 A.2d 1239, 1242 (Pa. Super. Ct. 1999). Only where the contract language is capable of being reasonably understood in more than one sense is a contract ambiguous. *Ins. Adjustment Bureau, Inc. v. Allstate Ins. Co.*, 905 A.2d 462, 468-69 (Pa. 2006). Where the alternative meaning is unreasonable, there is no ambiguity. *Murphy*, 777 A.2d at 430.

The parties disagree on whether the statements constitute "disparaging" remarks. The defendants argue that because the statements are true, they are not disparaging. Truth is not the test. Furthermore, the plain language of the provision is much broader, encompassing more than disparaging comments. The prohibition covers "unfavorable remarks, comments or criticisms" – whether true or false.

In the Second Settlement Agreement, the parties agreed to refrain from making disparaging or unfavorable remarks with regard to the company, its directors, officers, and executives concerning any action taken or statement made prior to May 19, 2011. Our task at this point is to determine whether the statements that USAT challenges fall within the ambit of statements prohibited by the non-disparagement provision.

The challenged statements in SAVE's press release highlight the net losses USAT has sustained under Stephen Herbert's leadership since 1999, accuse the board of diluting shares from May 2010 to March 2011, and question board member Douglas Lurio's independence by noting that his law firm has billed the company $2,300,000 over the past

five years.  The statements clearly critique actions taken by USAT's directors, officers, and executives prior to May 19, 2011.

Under the plain meaning of the non-disparagement provision, the statements at issue are prohibited.  They are unfavorable remarks and criticisms.

The statements also run afoul of the provision's second sentence.  The parties agreed to refrain from engaging in "any publicity or other activity that . . . could damage or impair the business, goodwill or reputation" of the parties.  The statements at issue question Stephen Herbert's and the board's management of USAT, and Douglas Lurio's independence.  The statements have the potential to impair the board's goodwill with USAT shareholders and damage its reputation with USAT's customers.  Indeed, in their campaign to take over the board, the defendants intend these statements to adversely reflect on the board members whom they are challenging.

Similarly, the assertions in SAVE's preliminary proxy statement that USAT challenge also violate the Agreement.  The statements discuss USAT's declining share price over a ten-year period, its net losses over the last three fiscal years, and the net cash it used in operating activities from June 30, 2009.  The remarks are unfavorable to the company and could impair the business, goodwill, or reputation of the company and its directors.

In SAVE's most recent filing, it states that it excised the challenged material from its preliminary proxy statement and submitted a proposed preliminary proxy statement to USAT.  In response, USAT objected to the paragraph: "In addition, Glass Lewis & Co., a leading independent proxy advisory firm, in its report dated May 27, 2011, gave the Company's executive compensation a 'D' grade.  In assigning this grade, Glass Lewis specifically noted that the Company had 'performed worse than its peers.'"  As USAT

conceded during the May 9 hearing, SAVE may reference the Glass Lewis report.[7] However, SAVE's statements go a step further and necessarily implicate the company and board's actions prior to May 19, 2011. The report was published eight days after the Agreement's trigger date, and the cited text could only be construed to criticize pre-May 19, 2011 performance. Therefore, the statements fall within the non-disparagement provision's prohibition on unfavorable remarks.

USAT also objected to the statements that "the Company is still losing money," "the Company continues to burn through cash," and "[w]e urge all shareholders to review carefully the Company's long-term share price performance." These statements do not violate the non-disparagement provision. They are general statements that do not specifically reference any activity prior to May 19, 2011.[8]

SAVE argues that the statements fall within exception 9(c) because SAVE has an obligation under securities laws to inform shareholders about the SAVE candidates' positions prior to the June 28, 2012 proxy contest. However, counsel for SAVE conceded during the hearing on May 9, 2012 that SAVE was under no obligation to publish a press release on its website criticizing the board's management of USAT stretching back to 2009.[9] Exception 9(c) does not protect the statements in the press release.

Likewise, the remarks in the initial and revised preliminary proxy statements do not

---

[7] Hr'g Tr. 28, May 11, 2012.

[8] Although USAT objected to SAVE's "urg[ing]" all shareholders to review carefully the Company's long-term share price performance," USAT references in its own materials "Tirpak's history with USAT" and that Tirpak "insists on once again causing a distraction for USAT." Flemming Decl. Ex. 9, at 99-2, Apr. 24, 2012 USAT e-mail to company employees. In light USAT's inconsistency on what violates the non-disparagement provision, we caution that the provision applies with equal scope to both parties, and USAT is expected to fulfill its obligations in good faith.

[9] Hr'g Tr. 15-16, 42.

fall within the Section 9(c) exception.  The defendants argue that the challenged statements fulfill the purpose of Section 14(a) of the Securities and Exchange Act of 1934 and Rule 14a-9, which was promulgated under the Act.  Taken together, Section 14(a) and Rule 14a-9 ensure the disclosure of material information to shareholders so they may make informed decisions.  *See TCS Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 441, 444 (1976).  However, the defendants may, consistent with the time limitations they agreed to in the non-disparagement provision, criticize the board's recent record.  To assess the performance prior to May 19, 2011, USAT shareholders will have access to the information in the challenged statements through the company's financial statements.  These avenues of information ensure that the shareholders will be able to make an informed decision.  Thus, the purpose of Section 14(a) and Rule 14a-9 is not frustrated by enforcing the non-disparagement provision.

Because they are disparaging or, at least, unfavorable remarks and criticisms which do not fall within any exception, the statements violate the non-disparagement provision.  Therefore, USAT has demonstrated that it is likely to succeed on its underlying breach of contract claim.

*The Threat of Irreparable Harm to USAT*

The second factor requires USAT to show that harm, which cannot be remedied after trial, is likely.  *Campbell Soup Corp. v. ConAgra, Inc.*, 977 F.2d 86, 91 (3d Cir. 1992).  Absent exceptional circumstances, economic loss does not constitute irreparable harm.  *Minard Run Oil Co. v. U.S. Forest Serv.*, 670 F.3d 236, 255 (3d Cir. 2011).  Hence, "[t]he possibility that adequate compensatory or other corrective relief will be available at a later

date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm." *Acierno v. New Castle Cnty.*, 40 F.3d 645, 653 (3d Cir. 1994) (quoting *Sampson v. Murray*, 415 U.S. 61, 90 (1974)).

In the Second Settlement Agreement, the parties agreed that "irreparable injury to the other party hereto would occur in the event any of the provisions of this Agreement . . . were otherwise breached."[10]   Although this agreement is not dispositive to our irreparable harm analysis, it is instructive.  *N. Atl. Instruments, Inc. v. Haber*, 188 F.3d 38, 49 (2d Cir. 1999); *Telamerica Media Inc. v. AMN Television Mktg.*, No. 99-2572, 1999 WL 1244423, at *5 (E.D. Pa. 1999); *Dice v. Clinicorp, Inc.*, 887 F. Supp. 803, 810 (W.D. Pa. 1995); *cf. Martin Marietta Materials, Inc. v. Vulcan Materials Co.*, No. 7102, slip op. at 132-33 (Del. Ch. May 4, 2012) ("In Delaware, parties can agree contractually on the existence of requisite elements of a compulsory remedy, such as the existence of irreparable harm in the event of a party's breach, and, in keeping with the contractarian nature of Delaware corporate law, this court has held that such a stipulation is typically sufficient to demonstrate irreparable harm.").

Parties may not create a right to injunctive relief by agreement where such relief is otherwise inappropriate.  *Firemen's Ins. Co. of Newark v. Keating*, 753 F. Supp. 1146, 1154 (S.D.N.Y. 1990).  Where parties agree that the breach of a contract would cause irreparable harm, courts also look to the nature of the harm to determine whether preliminary injunctive relief is appropriate.  *Ticor Title Ins. Co. v. Cohen*, 173 F.3d 63, 69

---

[10] Settlement Agreement ¶ 11.  The provision continues that the parties agree each party "shall be entitled to specific enforcement of, and injunctive relief to prevent any violation of, the terms hereof and the other party hereto will not take any action, directly or indirectly, in opposition to the party seeking relief on the grounds that any other remedy or relief is available at law or in equity . . . ."  *Id.*

(2d Cir. 1999); *N. Atl. Instruments, Inc.*, 188 F.3d at 49; *LNB Bancorp, Inc. v. Osborne*, No. 09-643, 2009 WL 805136, at *3 (N.D. Ohio Mar. 28, 2009).   Nonetheless, the parties' agreement that the breach of a contract would result in irreparable harm constitutes evidence of such harm.   *Ticor Title Ins. Co.*, 173 F.3d at 69; *Telamerica Media Inc.*, 1999 WL 1244423, at *5; *N. Atl. Instruments, Inc.*, 188 F.3d at 49; *Dice*, 887 F. Supp. at 810.

Here, the parties agreed that irreparable injury would result from a breach of the Second Settlement Agreement.   This agreement, reached by sophisticated parties after negotiation, favors a finding of irreparable harm.

In its press release, SAVE criticizes the board's management dating back to August 1999.   It also questions the independence of board member Douglas Lurio for the fees his law firm billed USAT over the past five fiscal years.   These statements are damaging to the board's reputation and its goodwill with its shareholders.

The harm will likely survive the election.   Claims, whether proven or not, would persist after June, 2012.   Whether a board member would not have been defeated but for the statements made by SAVE that violate the non-disparagement provision would be difficult, if not impossible, to determine.

SAVE and its members are sophisticated parties who negotiated the Second Settlement Agreement with the assistance of counsel against the backdrop of the future proxy contest.   They agreed that violations of the non-disparagement provision would cause "irreparable injury."   They cannot now make statements violating the provision and then argue there is no irreparable harm.   Based on the likelihood of the harm and the parties' agreement that violating the non-disparagement provision would constitute "irreparable injury," we conclude that USAT would be irreparably harmed in the absence

of a preliminary injunction.

*Balance of the Equities*

In balancing the equities under the third factor, we compare "the potential injury to the plaintiff if an injunction does not issue versus the potential injury to the defendant if the injunction is issued." *Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharm. Co.*, 290 F.3d 578, 596 (3d Cir. 2002). SAVE argues that granting a temporary injunction would impose an extreme hardship on it because it would be prevented from "full and complete disclosure of [its] views regarding the board's slate."[11] We disagree.

The non-disparagement provision limits, as agreed, SAVE's ability to challenge the board's record prior to May 19, 2011. SAVE is permitted to criticize the board's record since that time. Thus, an injunction enforcing the terms of the non-disparagement provision does not prevent SAVE from vigorously challenging the board's recent activities in support of its candidates.

The agreement imposes reciprocal limitations. Just as SAVE is prohibited from making disparaging or unfavorable remarks about USAT and its directors, so are USAT and its directors prohibited from making similar remarks about SAVE and its leaders. For example, the Agreement prohibits the board from specifically referencing that Tirpak faced removal from the board for purported violations of USAT's Code of Business Ethics prior to May 19, 2011. Because the non-disparagement provision applies with equal force to

---

[11] Tirpak Decl. Ex. B ¶ 12.

statements made by USAT's Board, the equities are balanced.

The consequences of enforcing the non-disparagement provision were created by the defendants.  SAVE agreed to it.  Any limitation on SAVE's advocacy during the proxy contest is of its own making.  "The self-inflicted nature of any harm suffered by [SAVE] also weighs in favor of granting preliminary relief."  *Pappan Enters., Inc. v. Hardee's Food Sys., Inc.*, 143 F.3d 800, 806 (3d Cir. 1998); *see also Novartis Consumer Health, Inc.*, 290 F.3d at 596 ("The injury a [nonmoving party] might suffer if an injunction were imposed may be discounted by the fact that the [nonmoving party] brought that injury upon itself.").

Any burden to SAVE in complying with the non-disparagement provision is offset by the reciprocal limitations placed on USAT.  SAVE got what it bargained for in the negotiations.  SAVE may criticize and attack the recent record of USAT's Board to advocate on behalf of its candidates.

*The Public Interest*

With respect to the fourth factor, there is a strong public interest in enforcing valid contracts.[12]  *See MarbleLife, Inc. v. Stone Res., Inc.*, 759 F. Supp. 2d 552, 563 (E.D. Pa. 2010) ("As this is in essence a breach of contract dispute, the public interest favors enforcing valid contracts and making the parties live up the their agreements."); *Siemens Bldg. Techs., Inc. v. Camacho*, 168 F. Supp. 2d 425, 427 (E.D. Pa. 2001) ("As a general matter, it is in the public interest to enforce valid contractual obligations and to protect legitimate business interests."); *accord Martin Marietta Materials, Inc. v. Vulcan Materials*

---

[12] SAVE does not challenge the validity of the non-disparagement provision in the Second Settlement Agreement.

*Co.*, No. 7102, slip op. at 131 (Del. Ch. May 4, 2012) ("Ultimately, disrespecting contracts seems to threaten far more harm to investors in a capitalist economy than it does good."). Furthermore, a knowing and intelligent waiver of constitutional rights "subsumes consideration of the public's interest." *Erie Telecomms. Inc. v. City of Erie*, 853 F.2d 1084, 1099 (3d Cir. 1988).

SAVE argues that the public interest in enforcing contracts is outweighed by the shareholders' right to be fully informed before they vote for USAT's Board.   We acknowledge that the shareholders should have the benefit of disclosure of the board's record prior to May 19, 2011.   However, SAVE is not the only possible source of the information that SAVE implies will be withheld if an injunction is issued.   As SAVE's counsel acknowledged during oral argument, USAT shareholders will have access to the same factual information in its challenged press release through the company's proxy statements.[13]   They will not have it with SAVE's spin on it.

SAVE also argues that shareholders "are entitled to hear not only self-congratulatory comments of the incumbents but also the opinions offered by the rival slate."   This argument has no force.   The non-disparagement provision does not prevent SAVE's candidates from offering opinions about their own candidacies, and the recent performance of USAT and its board.

### Free Speech Rights

SAVE alternatively argues that issuing a preliminary injunction would violate the First

---

[13] Hr'g Tr. at 29-30.

Amendment to the United States Constitution and its corollary in the Pennsylvania Constitution.   Before addressing the merits of this argument, we first ask whether constitutional protections apply in this case.

*State Action*

Although not addressed by the parties, we must determine if issuing an injunction constitutes state action.  If it does, First Amendment protections are triggered.

The First Amendment applies only to state action.  *Democratic Nat'l Comm. v. Republican Nat'l Comm.*, 673 F.3d 192, 204 (3d Cir. 2012) ("*DNC*") (citing *Cent. Hardware Co. v. NLRB*, 407 U.S. 539, 547 (1972)).  Court enforcement of private agreements may constitute state action.  *Id.* (citing *Shelly v. Kraemer*, 334 U.S. 1, 19-20 (1948)).  When a court enforces a private agreement through the application of state law, which "creates obligations never explicitly assumed by the parties," it is state action.  *Cohen v. Cowles Media Co.*, 501 U.S. 663, 668 (1991).  In other words, where the court expands the scope of the contract terms, its doing so may constitute state action.  In *Cohen*, the Supreme Court held that allowing the plaintiff to recover under a promissory estoppel theory would require state action because the theory is a state law doctrine, which, in the absence of a contract, would impose obligations the parties did not assume.  *Id.*  However, there is no state action when a court "approv[es] or acquiesce[s] in the initiatives of a private party."  *Blum v. Yaretsky*, 457 U.S. 991, 1004-05 (1982); *see also United Egg Producers v. Standard Brands, Inc.*, 44 F.3d 940, 943 (11th Cir. 1995) (holding enforcement of a non-disparagement provision in a stipulation does not constitute state action, and thus does not trigger First Amendment protections).  Thus, in the context of a contractual limitation of

15

speech, there is no state action unless the court enjoins speech that is beyond the scope of the parties' agreement.

The litigants are parties to the Second Settlement Agreement.  We are not asked to impose duties and obligations upon persons who did not agree to assume them.  *See Shelley*, 334 U.S. at 19 (holding that enforcing a racially restrictive covenant against people not parties to the original agreement constituted state action).  Nor are we asked to limit speech that was not covered by the parties' agreement.  In the specific performance provision in the Second Settlement Agreement, the parties agreed that injunctive relief was an appropriate remedy for a breach of any part of the Agreement.[14]  Relying on this provision, USAT seeks a preliminary injunction to stop SAVE from violating the non-disparagement provision.  In issuing an injunction, we would be enforcing the agreement of private parties, *Blum*, 457 U.S. at 1004-05, not imposing additional obligations that the parties had not agreed to assume.  *Cohen*, 501 U.S. at 668.  Therefore, enforcing the Second Settlement Agreement does not constitute state action.

Although there is no state action triggering First Amendment protection, we shall analyze the defendants' argument that an injunction would amount to prior restraint of their free speech rights under both the United States and Pennsylvania Constitutions.  In doing so, we consider whether they waived their rights.

## *Waiver of Free Speech Rights*

Constitutional rights, including those guaranteed by the First Amendment, may be

---

[14] *See* Second Settlement Agreement § 11 ("[The parties] shall each be entitled to specific enforcement of, and injunctive relief to prevent any violation of, the terms hereof . . . .").

waived by agreement.  *See DNC*, 673 F.3d at 205 (quoting *Erie Telecomms., Inc.*, 853 F.2d 1084).  Accordingly, "court enforcement of a private agreement to limit a party's ability to speak or associate does not necessarily violate the First Amendment."  *Id.* (citing *Ry. Emps. Dep't v. Hanson*, 351 U.S. 225 (1956)).  In deciding whether a party waived its federal constitutional rights by agreement, we do not apply Pennsylvania contract principles.  The question of waiver of a federal constitutional right is a question of federal law.  *Erie Telecomms., Inc.*, 853 F.2d at 1094 (3d Cir. 1988).

The party asserting a waiver must prove by "clear and compelling evidence" that the waiver was voluntary, knowing, and intelligent.  *DNC*, 673 F.3d at 205.  A written agreement negotiated by counsel serves as such evidence.  *Id.*  Consideration in exchange for the restriction is also evidence of a waiver.  *See id.* at 206 (citing *D.H. Overmyer Co. of Ohio v. Frick Co.*, 405 U.S. 174, 186-87 (1972)).  We also look at the particular facts and circumstances surrounding the agreement, including the bargaining power of the parties, whether the terms were negotiated, whether the waiving party was advised by competent counsel, and whether the waiving party has engaged in other contract negotiations, to determine if there was a voluntary, knowing, and intelligent waiver.  *Id.*

In *DNC,* the RNC's counsel negotiated and executed two settlement agreements that required it to refrain from engaging in ballot security programs without first obtaining district court approval. *Id.* at 196, 203.  In return, the DNC agreed not to pursue claims against the RNC in the associated litigation.  *Id.* at 206.  The existence of the signed agreements, which conferred benefits to the RNC, constituted clear and compelling evidence of a waiver.  *Id.* at 205-06.

The *DNC* Court also looked to the sophistication of the parties and the process by

17

which the agreements were reached to hold that the RNC waived its First Amendment rights. Relying on *Erie Telecommunications, Inc.*, 853 F.2d at 105 (citing *D.H. Overmyer*, 405 U.S. at 186), it reasoned that a finding of an informed and voluntary waiver was supported by the existence of the agreements and that the "RNC has widespread activities, had equal bargaining power with the plaintiffs, and has not contended that it was unaware of the significance of the Decree, which it was free to decide to not enter into." *Id.* at 206. Thus, the two settlement agreements, negotiated and signed by RNC's counsel, constituted clear and compelling evidence that the RNC voluntarily, knowingly, and intelligently waived certain First Amendment rights. *Id.* at 206-07.

Here, there is clear and compelling evidence that USAT waived its First Amendment rights to speak about the board's pre-May 19, 2011 record. The parties entered into a written agreement supported by adequate consideration. The agreement was not a one-way street. It conferred benefits on SAVE as well as USAT. It was negotiated by counsel. In the Settlement, USAT agreed to what Tirpak acknowledges were "significant corporate governance changes."[15] Significantly, the non-disparagement provision applies with equal force to statements made by USAT's Board. In other words, SAVE received the benefit of the board waiving its rights to challenge SAVE's members' records. This benefitted Tirpak in particular because the board was prohibited from referencing that he could have been discharged or removed from the board for violating USAT's Code of Business Conduct and Ethics before May 19, 2011.[16]

---

[15] Tirpak Decl. Ex. B ¶ 4.

[16] Hr'g Tr. 6, 17-18.

The non-disparagement provision was the product of negotiation with the participation of the parties' attorneys.[17] During the negotiation, SAVE's counsel succeeded in limiting the scope of the provision, which in its initial form had no time limit.[18] The written agreement, negotiated by counsel, which confers benefits to SAVE and its members, is clear and compelling evidence of a waiver. *See DNC*, 673 F.3d at 206-07 (holding that consideration to the restricted party in a written agreement negotiated by counsel is clear and compelling evidence of waiver).

The defendants argue that it is "untenable" that SAVE, anticipating a proxy contest in 2012, would have waived its right to criticize the board for its pre-May 19, 2011 conduct. Insofar as this argument implies that SAVE was unaware of the significant consequences of the non-disparagement provision,[19] it is belied by the fact that the defendants agreed to broad and unambiguous language that worked in favor of all parties – each giving up and getting something in return. Importantly, SAVE's counsel successfully limited the scope of the provision, which as originally drafted, applied without any time restriction. *See D.H. Ovemyer Co. of Ohio*, 405 U.S. at 186-87 (holding that the restricted party could not claim it was unaware of the significance of the waiver provision because the provision was the product of negotiation). This temporal limitation is entirely consistent with SAVE's intention to engage in a proxy contest in 2012 because it allows SAVE to advocate for its slate by criticizing the board for its recent record, and at the same time limits USAT's comments

---

[17] Hr'g Tr. 13.

[18] Hr'g Tr. 13.

[19] It does not weigh against finding that USAT is likely to succeed on the merits because the non-disparagement provision is clear and unambiguous.

regarding the defendants' past conduct.

It is clear that the defendants knowingly, intelligently, and voluntarily waived their First Amendment rights to the speech proscribed in the non-disparagement provision. Thus, holding them to their agreement does not violate the First Amendment.

Article I, Section 7 of the Pennsylvania Constitution proclaims that "[t]he free communication of thoughts and opinions is one of the invaluable rights of man, and every citizen may freely speak, write and print on any subject, being responsible for the abuse of that liberty." As interpreted by the Pennsylvania Supreme Court, Article I, Section 7 is more protective of speech than its federal counterpart. *Pap's A.M. v. City of Erie*, 812 A.2d 591, 605 (Pa. 2002). We may not, in this diversity action, order an injunction if it contravenes the Pennsylvania Constitution. *Kramer v. Thompson*, 947 F.2d 666, 669-70 (3d Cir. 1991). Thus, even though issuing an injunction to enforce the parties' agreement does not violate SAVE's First Amendment rights, we must determine whether such an injunction would violate the Pennsylvania Constitution.

The parties have not identified, nor are we aware of, any Pennsylvania authority that has resolved this issue. Absent guidance from the Pennsylvania Supreme Court, we must predict how it would rule if faced with the issue. *Spence v. ESAB Grp., Inc.*, 623 F.3d 212, 216 (3d Cir. 2010). To inform our prediction, we examine relevant decisions of state intermediate appellate courts, federal courts interpreting the constitutional provision, other state supreme courts that have addressed the issue, and other sources such as "considered dicta." *Id.* We find the answer to this question from these sources as well as the terms to which the parties agreed.

The Pennsylvania Supreme Court has long held that one may waive a constitutional

right.  *See Commonwealth v. Sanchez*, 36 A.3d 24, 54-55 (Pa. 2011) (holding criminal defendant may waive his right under the Pennsylvania Constitution to a jury trial); *Pa. Bankers Ass'n v. Pa. Dep't of Banking*, 962 A.2d 609, 622 (Pa. 2008) ("It is without question that the right to a due process hearing, like most constitutional rights, can be waived."); *see also Commonwealth v. Coffey*, 608 A.2d 560, 563 (Pa. Super. Ct. 1992) ("Clearly, Constitutional rights are waivable.").  So also may the right to free speech be waived.  *See Kraemer Hosiery Co. v. Am. Federation of Full Fashioned Hosiery Workers*, 157 A. 588, 591 (Pa. 1931) ("[Article I, Section 7] is no higher, however, than the one which sustains the inviolability of legal contracts . . . .").

The requirements for finding a waiver under the Pennsylvania Constitution are no different that those required for a waiver of federal constitutional rights.  "Waiver is 'an intentional and voluntary relinquishment of a known right.'" *Commonwealth v. Lucarelli*, 971 A.2d 1173, 1179 (Pa. 2009) (quoting *United States v. Goldberg*, 67 F.3d 1092, 1099-1101 (3d Cir. 1995)); *See also Coffey*, 608 A.2d at 562-63 ("An individual may knowingly and intelligently waive a constitutional right.").  "For that individual to be able to make a knowing and intelligent waiver of a constitutional right, he must have been aware of both the nature of the constitutional right and the risk of forfeiting the same." *Coffey*, 608 A.2d at 563 (citing opinions).  Similar to the standard for waiver of federal constitutional rights, Pennsylvania law requires that the "record must clearly demonstrate an intentional relinquishment of a known right or privilege." *Id*.  (citing *Commonwealth v. Hill*, 422 A.2d 491 (Pa. 1980)).

Just as SAVE waived its First Amendment rights in the speech proscribed in the Settlement Agreement, it knowingly and intelligently waived its Article I, Section 7 rights to

that speech.

Unlike the First Amendment, Article I, Section 7 explicitly proscribes prior restraints on speech.   Consequently, Pennsylvania courts historically have struck down prior restraints, such as orders enjoining libel, leaving the victim to pursue a claim for damages only.  *See Kramer*, 947 F.2d at 679-80 (relying in part on *Willing v. Mazzocone*, 393 A.2d 1155 (Pa. 1978)).  Drawing on this line of cases, SAVE argues that we may not, consistent with Article I, Section 7, issue an injunction and order SAVE to remove the published statements that violate the contractual agreement.

In *Kramer*, there was no contract related to the speech at issue.  Critically for the injunction issue, unlike in *Kramer*, the parties here also agreed that an injunction was an appropriate remedy for a breach of the non-disparagement provision.  In Section 11 of the Second Settlement Agreement, titled "Specific Performance," the parties agreed that damages would not adequately compensate a breach of the agreement.  They also agreed that injunctive relief was necessary to prevent any violation of the agreement. Consequently, at the same time the defendants waived some of their free speech rights, they agreed to injunctive relief, which clearly contemplates and is a form of prior restraint.

## Conclusion

We conclude that the defendants violated the non-disparagement provision in the Second Settlement Agreement.  Enjoining them from violating the non-disparagement provision does not violate the United States or Pennsylvania Constitutions because the parties knowingly, intelligently, and voluntarily waived their rights to free speech through an unambiguous agreement negotiated by the parties.  They also agreed that an injunction

is an appropriate remedy for violations of the agreement.  Therefore, we shall grant USAT's motion and issue an injunction.